**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

Plaintiff,

v.

CRIMINAL NO. 25-264 (GMM) (HRV)

IDMACH J. ROSARIO,

Defendant.

## REPORT AND RECOMMENDATION

Pending before the Court is the defendant Idmach J. Rosario's (hereinafter "Rosario" or "Defendant") motion to suppress, (Docket No. 44), which the United States opposes. (Docket No. 53). The presiding District Judge referred the matter to me for report and recommendation. (Docket No. 45). For the reasons set forth below, I recommend that the motion to suppress be GRANTED.

### I.    PROCEDURAL BACKGROUND

The Grand Jury returned an indictment against Rosario charging him in two counts with possession of a firearm by a prohibited person (convicted felon) in violation of 18 U.S.C. § 922(g)(1) (Count One), and possession of a machinegun in violation of 18 U.S.C. § 922(o) (Count Two). (Docket No. 13). These charges stem from a Puerto Rico Police Bureau ("PRPB") operation conducted on May 20, 2025, to execute a state-court domestic violence arrest warrant issued against Rosario. On that day, PRPB agents forcibly entered Rosario's residence and arrested him. The police alleged that firearm magazines were observed in plain view in Defendant's kitchen and that Rosario

1

subsequently consented to a search of his vehicle wherein a fully automatic Glock pistol was found.

On October 20, 2025, Rosario moved to suppress the firearm and ammunition seized from his residence and vehicle, arguing that law-enforcement agents unlawfully entered his home in violation of his Fourth Amendment rights. (Docket No. 44). The Government filed its opposition on December 1, 2025, maintaining that the PRPB agents were authorized to enter the residence to arrest Rosario, that contraband was observed in plain view, and that Rosario voluntarily consented to a search of his vehicle. (Docket No. 53). I held evidentiary hearings over the course of two separate dates, January 9 and February 3, 2026. (Docket Nos. 68, 75). The Government presented three witnesses: PRPB Agent Bernabé González-Arce, PRPB Sergeant Jessica Pérez-Vélez, and ATF Task Force officer Carlos Alcoba-Freytes. The defense called Wilmari Chico-Galindez and Charlene Velázquez-Lugo to the stand. Several exhibits were also received into evidence. (Docket Nos. 71 and 76). Thereafter, the parties submitted post-hearing memoranda on April 8, 2026. (Docket Nos. 97, 98).

## II.   PROPOSED FINDINGS OF FACT

With the benefit of the parties' written submissions, as well as the documentary and testimonial evidence presented at the suppression hearings, I now make the following proposed findings of fact. Unless otherwise noted, these facts are largely undisputed.

### A.   PRPB Agent Bernabé González-Arce

Agent Bernabé González-Arce ("Agent González") has worked at the PRPB for the past 25 years. In May 2025, he was assigned to the Arecibo arrest unit. His duties include

executing arrest warrants. Agent González explained that once an arrest warrant is delivered to him, he investigates the location of residence of the person to be arrested. The investigation entails speaking to the investigating officer, looking up information about where the person lives, and establishing a work plan to conduct the arrest.

Agent González was given a warrant for the arrest of Rosario which related to a Law 54 (domestic violence) violation. Agent González then interviewed officer Esteban Candelaria ("Officer Candelaria"), the investigating agent, to ascertain where Rosario resided. Officer Candelaria provided Agent González the location of Rosario's residence and a photograph of it (Government's Exhibits 1, 1.1, and 2). Agent González also interviewed the alleged victim of the domestic violence incident, and she indicated that Rosario lived in the town of Vega Baja. The photograph provided to Agent González by fellow Officer Candelaria (Exhibit 2) had a red circle around the house that was identified as Rosario's residence. In addition to the photograph, Agent González received the location of the residence, also known as a "pin". The Law 54 investigating agent obtained the pin by going to the residence "to summon the individual." (Transcript "Tr." of Suppression Hearing (Day 1), Docket No. 84 at 30).

On May 20, 2025, at 5:00 a.m., Agent González, along with several other officers, went to the residence following the directions of the pin that he got from the investigating agent. After identifying the residence, the agents knocked on the door, identified themselves as police and opened the door. As they entered the residence, "Idmach [Rosario] was there in front of the gate." (Id. at 20). Agent González was at the frame of the door when he first saw Rosario, who was approximately three feet away in front of a staircase that leads to the second story of the house. To the left, Agent González was able

to see the kitchen which had a round table in front of a smaller table that had a microwave. He affirms that he saw two firearm magazines on the same table where the microwave was. The magazines were in front of the microwave. Agent González saw the magazines for the first time "when [he] was standing there at the door." (Id. at 22).[1]

Upon seeing the magazines, Agent González asked Rosario if he had a permit to carry firearms. Rosario responded he did not. Then, after reading him his Miranda rights, Agent González asked Rosario if he had a firearm to which Rosario said yes; that he had a firearm in his vehicle, a 2022 light green Toyota Tacoma. The Tacoma was parked in front of the residence. Agent González had Rosario sign a document acknowledging that he understood his Mianda rights. (Exhibit C).  The form was signed by Rosario inside the house "next to the table." (Tr. at 24). It was also signed by Agent González and fellow PRPB officer Allende. Then, Agent González requested that Rosario sign a consent form "authorizing [him] to seize the firearm." (Id.).[2] The form was also completed inside the residence "at the table." (Id.).

After Rosario signed the consent form, he "handed" the agents the keys to the vehicle. (Id. at 25). The vehicle was opened by Agent González in the presence of Rosario, and a firearm was seized from the driver's seat floor. Rosario told Agent González that there was a magazine in the console between the two front seats. Such pistol magazine was also seized. Back at the house, Rosario told Agent González that there was another

---

[1]     This fact is disputed. Rosario claims there were no firearm magazines in plain view.

[2]     This fact is also disputed. Rosario claims that he did not sign any consent forms at his house, that the forms were signed at the police station. (Docket No. 44 at 3; Docket No. 97 at 16).

pistol magazine in a drawer in one of the bedrooms on the second floor. Another consent form was executed after which the magazine in the bedroom upstairs was seized. No other areas on the second floor were searched according to Agent González. After this, they left the residence, went to the PRPB San Juan Drug Division, and consulted the case with ATF.

On cross examination, Agent González testified that when he interviewed Officer Candelaria the latter sent him a photo of the residence and said: "This is Mr. Rosario's residence" but did not say how he knew. (Id. at 35-36). And the complainant simply told Agent González that Rosario lived in Vega Baja. (Id. at 37). Agent González admitted that he conducted no surveillance. Also, even though the complaint (denuncia) was attached to the arrest warrant, Agent González did not read it. Further, the cross-examination of Agent González established that he had no prior knowledge that Rosario had firearms, did not review the work plan, and did not remember the exact number of officers that were with him on May 20, 2025. (Id. at 41-47).

Still answering questions from defense counsel, Agent González testified that upon arrival to the house on May 20, 2025, he knocked and announced himself as police, and, almost immediately thereafter, broke down the first door with a crowbar and used a battering ram to open the second door. (Id. at 47). It "may have been about a minute" between announcing his presence and breaking down the door. Agent González further testified that he does not need to give a person a chance to open first. If the door is not opened "within seconds" he can force entry. (Id. at 48). Prior to breaking the door, the agent did not hear anyone say anything inside. Rosario was three feet away and complied with the agent's instruction to turn around so that he could be handcuffed. Rosario was

never placed on the ground; he was cooperative and peaceful. As to the Miranda waiver, Agent González was confronted with the form (Exhibit C), where Rosario marked that he did not waive his rights. The agent responded that Rosario never said he did not want to speak or that he wanted an attorney. (Tr. at 53).

Immediately after signing the Miranda form, Rosario provided written consent to search the vehicle and later a second written consent for the residence. Agent González said on cross that the handcuffs, which had initially been placed with his hands behind his back, were changed to have his hands in front so that he could sign and that he remained with the handcuffs in the front during the rest of the intervention. (Id. at 58). Agent González also told defense counsel that their firearms were always holstered and that no officer conducted a search of the house. The agent insisted that Rosario got the keys to the Tacoma himself from a very disorganized table and handed them to the agent. (Id. at 63). There were no photographs taken of the house or the vehicle during the intervention. (Tr. at 66). He also said that he had no information about a Toyota Tacoma prior to arriving at the house. When asked why, if the intervention had been peaceful, agents ended up taking Rosario to the hospital, Agent González responded that he (Rosario) claimed that his hand was hurt upon the opening of the gate, that "he got hit." (Id. at 67).

On re-direct, the agent testified that his investigation is only limited to the arrest warrant, that is, about the person to be arrested and the location. (Id. at 68). He does not need to go into details of the incident for which the warrant was issued. Agent González also said that a small wall separated the kitchen and the living room, that the kitchen is small, and if someone was to stand in living room, he could partially see what is

6

happening in kitchen. (Id. at 69). To a question posed by the undersigned, Agent González testified that Rosario had a visible mark which implied he had been hurt. He said: "It was like a scratch on his hand, on his finger, something like that." (Id. at 70).

**B.      PRPB Sergeant Jessica Pérez-Vélez**

Sergeant Jessica Pérez-Vélez ("Sergeant Pérez") has been a sergeant for six years and works at the Arecibo Gender Violence Unit. (Tr. at 77). In May of 2025, her unit investigated a gender violence complaint regarding an incident that occurred between May 13 and 14, 2025 involving Rosario. Officer Candelaria was assigned to investigate said complaint. Charges were eventually filed and an arrest warrant issued against Rosario.  The investigation revealed that Rosario was residing at Almirante Norte in Vega Baja, Road 160. The victim stated that Rosario lived at that address.  (Id. at 79).

According to Sergeant Pérez, Officer Candelaria, the investigating agent, went to Rosario's residence with the victim. The victim pinpointed the residence from the main road "practically in front of the residence." (Id. at 80). Officer Candelaria then contacted Sergeant Pérez and sent her photographs of the house through WhatsApp. (Id.). One of the images she received is Exhibit 1. Officer Candelaria clarified that of the two residences depicted, the beige one was Rosario's. Sergeant Pérez was the one who placed the red circle on the photograph. (Id. at 82; see also Exhibit 2). Officer Candelaria also sent Sergeant Pérez the location by way of a "pin." (Exhibit 3). Exhibit 3 reflects an area in Vega Baja but not the exact location of the residence; it reflects an approximate location. Sergeant Pérez drew a square on Exhibit 3 and testified she was one hundred percent sure she identified Rosario's residence. (Tr. at 85-86). However, she was not part of the team that executed the arrest warrant. (Id. at 86).

On cross-examination, Sergeant Pérez testified that the domestic violence charges filed against Rosario related to damage to a cellphone. (Tr. at 88). Charges were filed in absentia and later dismissed. The alleged victim is Karielis Meléndez who testified at state level. The state court found no probable cause at the preliminary hearing. Fellow Officer Candelaria sent her WhatsApp messages with photos of the residence and the pin. She was shown screenshots of the conversation, and she recognized it. (Tr. at 90; Exhibit D). The texts were sent on May 15, 2025. Sergeant Pérez never spoke directly with the domestic violence complainant, and she had no information about how the complainant may have known it was Rosario's residence or how recent the information was. (Tr. at 95). She admitted there was no surveillance conducted. Sergeant Pérez sent the arrest warrant to Gamalier Delgado, the supervisor of the Arecibo arrest unit, along with the photograph and the pin. However, she never spoke with Agent González and did not know if Officer Candelaria spoke to anyone at the Arecibo arrest unit. (Tr. at 97). Officer Candelaria went with victim at night in a marked police unit. (Id. at 98).

## C.    TFO Carlos Alcoba-Freytes

Task Force Officer Carlos Alcoba-Freytes ("TFO Alcoba") has worked as an ATF TFO since 2017. (Id. at 106). In said role, he is tasked with investigating any and all federal violations related to alcohol, tobacco, firearms, explosives, and narcotics. TFO Alcoba knows who Rosario is as he was present during the latter's custodial interview. TFO Alcoba explained that PRPB agents called the ATF about an arrestee found in possession of a machinegun. The custodial interview of Rosario was conducted on May 20, 2025. Present were Clifford Mahaley, TFO Orlando De Jesus, and himself. (Id. at 108). The interview was conducted in Spanish and Miranda warnings were provided.

Exhibit 4 is the recording of the interview. (Tr at. 110). Exhibit 5 is the waiver of Miranda rights.

Relevant portions of the recorded interviewed were played. For instance, Rosario was asked about the magazines found in the kitchen area and the following exchange took place: "Okay, the, the... when the police comes in, they observed, there were some, some magazines, some magazines, with bullets...[o] on the microwave table...." (Docket No. 72-1 at 2). He replies: "... I heard, I heard what he told you... Yes, that was there." (Id.). When asked by the agent "[w]here was it, on top of the little table, that you have next to the microwave, in the little kitchen...?", Rosario responded: "There's the refrigerator...and above the refrigerator in the cupboard...[t]hey [the magazines] were on." (Id.). In the custodial interview, Rosario also admitted during the interview that PRPD agents asked him if he had something illegal and he told the agents that he had a firearm in his truck and the exact location within the vehicle. (Docket Nos. 72-2 and 72-3). He also acknowledged that he "gave" the agent the keys to the truck. (Docket No. 72-3 at 2).

**D.     Wilmari Chico-Galindez**

Wilmari Chico-Galindez ("Ms. Chico") testified that Rosario is her partner of almost four years. (Tr. at 132). On May 20, 2025, between 6:00 and 7:00 a.m., she was at the residence where she lives with Rosario; they were sleeping in the bedroom. The house is located in Almirante (Vega Baja), close to Exit 35. She identified the house by making a red mark on Government's Exhibit 3. Said document then became Defense's Exhibit E. Her 4-year-old daughter was also present, sleeping in her bedroom. (Tr. at 136). While sleeping, she heard a loud noise at the door downstairs. She and Rosario

headed downstairs; it took them less than 15 seconds. (Id. at 137). Rosario walked first and Ms. Chico was right behind him. Initially, they could not tell who was on the other side of the door but then realized it was the police. When they arrived downstairs, the door was already broken. The police did not give Rosario a chance to open the door; they kicked it in. A screen door hit Rosario in his hand. (Tr. 138).

Ms. Chico further testified that as the police officers entered the house, they told her and Rosario to put their hands up. (Id.). The officers threw Rosario on the floor and placed handcuffs on him in the back. According to her testimony on direct examination, five or six armed officers entered the house. One officer pointed a gun at them. From where Ms. Chico was standing, she could see the entire Kitchen area. (Tr. at 140) There wasn't anything illegal or dangerous in the kitchen according to her. She testified: "Because every night before we go to sleep, we check the kitchen and we clean it." (Id.). Because of the ruckus, the four-year-old girl woke up and called for her mom. Rosario had told agents there was a minor in the house, but the agents "continued" and did not allow Ms. Chico to get the little girl until she began crying. (Tr. at 141). Ms. Chico also testified that she was wearing a transparent shirt. Later when they allowed her to change, as there were no female officers, she had to change in front of male officer. One officer went into the little girl's room first, opened the door, and pointed a flashlight. Only then was Ms. Chico allowed to pick her up and go back downstairs. (Tr. at 142). It was very quick. The little girl then saw Rosario bleeding and handcuffed. (Id. at 143).

Ms. Chico also testified that Rosario "was always handcuffed on his back." (Id. at 144). She remained in the living room for most of the intervention. While there, one of the officers told her that they were going to take little girl away and send her to the

10

Department of Family Services unless Rosario cooperated. (Id.). Later, when one of the officers needed to use the bathroom to urinate, instead of asking her or Rosario to use the bathroom, another officer said: "Oh, well, you're in your house. Just go wherever." (Id.). Ms. Chico was able to see that officers "checked" the kitchen while Rosario remained sitting in a chair the entire time until they took him out to the truck. (Id. at 144-45). According to Ms. Chico, when the officers brought Rosario back from the Tacoma, they sat him on the same chair. She stated that the entire event lasted approximately two and a half hours. (Id. at 145). The officers rummaged through the kitchen and climbed on top of cabinets. (Id. at 146). They also checked the little girl's room and asked if cameras were working. (Id. at 147). The house was left "[d]isorderly." (Id.).

On cross-examination, Ms. Chico testified that she has known Rosario since 2016 and that she has been in a relationship with him for almost 4 years, that is, since Christmas 2022. (Id. at 147-48). On May 20, 2025, the residence was Rosario's. He has lived there for a long time. She, on the other hand, has not resided there continuously during the 4 years they have been in a relationship. This is so because they "split up from March to about Mother's Day in May." (Id. at 148). Ms. Chico is aware Rosario was in relationships with other females. During the time of the breakup, they had no contact, but she "saw something online." (Id. at 149). That is how Ms. Chico learned of a relationship with another female by the name of Karielis. During that time, Ms. Chico was not living in the house. (Id.).

Ms. Chico testified she is aware that pistol magazines were found in the residence and that Rosario had a firearm in his vehicle. (Id. at 150-51). She is also aware that

another magazine was found in the bedroom they share. She admitted that she never called the police even though she knew that he did not have a firearms permit. (Id. at 151-52). Ms. Chico was also aware that Rosario had been sentenced to probation. She denied that she was angry that Karielis had posted intimate videos of her and Rosario, but she understood that it was illegal and wanted her to erase the videos to protect Rosario from the videos being disclosed. (Id. at 162).

Ms. Chico did not hear when the police arrived. She admitted that she could not see or hear everything that happened with Rosario on the first floor during the "less than literally twenty seconds" when she went upstairs to pick-up her daughter. (Id. at 163-64). She could not see everything that happened in the kitchen the entire time she was in the living room nor anything that happened outside with the vehicle. (Id. at 165-66). And she was not aware of everything Rosario spoke with agents that day. Rosario was bleeding "more or less" and the floor and the gate were stained with blood. (Id. at 167). As far as she knows, he has never been interviewed by federal agents. (Id. at 170). She did not see agents reading him his rights. (Id.). Ms. Chico also acknowledged that, after the arrest, she continues to live with Rosario and talks to him every day. (Id. at 171). Ms. Chico loves Rosario but was in court to tell the truth. Neither she nor her daughter financially depend on Rosario. (Id. at 72). Ms. Chico would not like Rosario to get in trouble or go to jail. (Id. at 173-74). She, however, denied that she would do anything for him.

**E.     Charlene Velázquez-Lugo**

Charlene Velázquez-Lugo ("Ms. Velázquez-Lugo") lives in Almirante Norte in Vega Baja and resided there on May 20, 2025. (Transcript "Tr." Further Suppression Hearing, Docket No. 82 at 4).  She has lived at the same address for seven years. (Id. at

4-5).   She knows Rosario because he is her next-door neighbor. Their houses are physically adjacent; they are fence to fence. (Id. at 5).   She identified her street and residence in Exhibit 3. Ms. Velázquez-Lugo described Rosario as quiet and calm. They have no personal relationship. (Tr. Further Suppression Hearing at 10). In fact, throughout her testimony, she identified Rosario as José.[3] However, Ms. Velázquez-Lugo identified Rosario in open court as his neighbor.

On May 20, 2025, Ms. Velázquez-Lugo was in the kitchen of her home, warming some milk for her baby. (Id.). She looked out the window after she heard police officers screaming in front of Rosario's house. She also saw when they broke down the door. (Id. at 11). She heard when they told him to get on the ground. (Id.). She further testified that they (the police) spent a lot of time there. (Id.). And that although she counted five or six police officers, not all entered the residence. (Id. at 14). Ms. Velázquez-Lugo could see what was happening from her window; she had a clear view and could see "the entire front of [Rosario's] house." (Id. at 12). She also saw police officers striking the security cameras in the ceiling Rosario's home with a stick. (Id. at 12-13). The next thing she saw was when they took him out handcuffed. (Id. at 14). He was handcuffed in the back. The officers took Rosario to his vehicle and then back inside the house. (Id. at 14-15). Afterwards, Ms. Velázquez-Lugo saw when the police took Rosario away. (Id. at 15). Ms. Velázquez-Lugo's best estimate is that four hours passed from the time they arrived and yelled "police" to the time that she saw the police take Rosario away. (Id.). Between the

---

[3]     I note that Defendant's second name is José. (Bail Report, Docket No. 15).

time the officers yelled police twice and the time they broke the door, "[n]ot even a minute" had passed. (Id. at 16).

On cross-examination, Ms. Velázquez-Lugo testified that she was unable to see anything on the second floor of Rosario's residence and is unaware of anything that happened or was said in the second floor of the residence as well as in the living room or kitchen area. (Id. at 24-25). She did not see anyone "grabbing a firearm" from inside Rosario's truck. (Id. at 26). Ms. Velázquez-Lugo wears eyeglasses. (Id.). When she does, her vision is "perfect." She was wearing them on May 20, 2025. (Id. at 27).

### III.    APPLICABLE LAW AND DISCUSSION

Rosario contends, first, that the forced entry into his home was unlawful under *Payton v. New York*, 445 U.S. 573 (1980), because the police did not have reliable evidence amounting to a reasonable belief that he lived at the residence or that he was there at the time. Defendant also argues that the firearm magazines were not in plain view, but even assuming *arguendo* they were, said exception to the warrant requirement would not apply because PRPB agents were not lawfully in a position where they could plainly view them. *See United States v. Graham*, 553 F.3d 6, 12 (1st Cir. 2009) (holding that if the initial entry is "unjustified the evidence discovered subsequent to it must be suppressed."). Rosario further claims that the record does not support a finding that the contraband in this case was uncovered as part of a valid protective sweep or that Rosario signed consent forms at the home as opposed to later at the police station. Rosario says that any consent given is in any event tainted by the unlawful entry. In advancing his position, Rosario asserts that the government witnesses were either not credible or did not have sufficient personal knowledge.

The Government responds that the PRPB agents had authority to enter the residence pursuant to the arrest warrant because they reasonably believed that Rosario lived at the residence and was present prior to entering the home. According to the Government, once lawfully inside, the agents had a basis under the totality of the circumstances to conduct a protective sweep of the premises. The Government further argues that the plain view doctrine provided the PRPB agents additional authority to enter the residence because Agent González could see the firearm magazines in the kitchen "[w]hile standing on the door frame." (Docket No. 98 at 8). At that point, and after Rosario confirmed he did not have a permit to carry firearms, the Government contends that Agent González had probable cause to believe Rosario was committing a weapons law violation and that provided him further grounds to enter and seize the magazines without a warrant. Defendant's custodial interview, says the Government, corroborates the plain view observations. Lastly, the United States submits that the totality of the circumstances established that Rosario voluntarily consented to the search of his home and vehicle.

## A.    Standard of Review

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend IV. A criminal defendant seeking to suppress evidence bears a threshold burden of showing that a Fourth Amendment violation occurred, which in turn encompasses the burden of establishing that he or she was subjected to a warrantless search or seizure. *See United States v. Young*, 835 F.3d 13, 19 (1st Cir. 2016); *see also United States v. Fields*, 823 F.3d 20, 25 (1st Cir. 2016). Once the defendant establishes that a warrantless search or seizure occurred, the burden shifts to the government to

15

prove by a preponderance of the evidence that said search or seizure was lawful. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *United States v. Delgado-Perez*, 867 F.3d 244, 250 (1st Cir. 2017) ("On a motion to suppress evidence seized on the basis of a warrantless search, the presumption favors the defendant, and it is the government's burden to demonstrate the legitimacy of the search.").

**B.        Entry Pursuant to an Arrest Warrant**

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. at 586. Police officers attempting to execute an arrest warrant have "limited authority to enter a dwelling in which the suspect lives when there is reason to believe that the suspect is within." *Id.* at 603. Even if the officers are mistaken as to the subject's residence, "no Fourth Amendment violation occurs if the officers enter a third party's home under the reasonable belief that the target named in the arrest warrant **resides** at the dwelling in question and **will be present** at the time of entry." *Solis-Alarcon v. United States*, 662 F.3d 577, 580 (1st Cir. 2011) (citing *United States v. Werra*, 638 F.3d 326, 336-37 (1st Cir. 2011) and *United States v. Graham*, 553 F.3d at 12-13)) (emphasis ours). In determining if officers had a reasonable belief that the defendant resided in a particular residence, the court "examine[s] the basis for that belief" as well as "the information known to the officers in the totality and not in isolation." *United States v. Graham*, 553 F.3d at 13-14 (cleaned up).

There is a circuit split on the question of what the reasonable belief standard means, with some circuits equating it to probable cause and others holding that it is a lesser standard. *See United States v. Bohannon*, 824 F.3d 242, 253 (2d.Cir. 2016)

(collecting cases). The First Circuit has not explicitly decided the issue. *United States v. Young*, 835 F.3d 13, 19 n.6 (1st Cir. 2016) (quoting *United States v. Werra*, 638 F.3d at 337) (noting that the First Circuit has implicitly accepted the majority view adopting the reasonable belief standard and treating it as less stringent than probable cause.); *see also United States v. Hamilton*, 819 F.3d 503, 506 n. 5 (1st Cir. 2016). Because our circuit has assumed without deciding that reasonable belief is a lesser standard than probable cause, but has not specifically defined it, I look to other circuits for guidance.

It has been said that "reasonable belief is not a finely-tuned standard" but "can only be ascertained through a weighing of the facts in the record, as it is a fluid concept that takes its substantive content from the particular contexts in which the standard is being assessed." *United States v. Thomas*, 429 F.3d 282, 286, 368 U.S. App. D.C. 285 (D.C. Cir. 2005) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). While the degree of certainty required for reasonable belief cannot be defined with precision, some guidance could be obtained from case law holding that the standard "requires more than a hunch as to presence, but less than a probability." *United States v. Bohannon*, 824 F.3d at 255. To satisfy this standard, the officers need only "have a basis for a reasonable belief as to the operative facts, not that they acquire all available information or that those facts exist." *United States v. Lovelock*, 170 F.3d 339, 344 (2d Cir. 1999).

Against this backdrop, I tackle the controversy at hand. I must determine whether the police officers had a reasonable belief that Rosario lived at the residence they forcibly entered on May 20, 2025, and whether they had more than a hunch, even if less than a probability, that he was present. On both prongs, and even under a standard less stringent than probable cause, I find that they did not.

### 1. *Residence*

At the outset, it is undisputed that there was an outstanding arrest warrant against Rosario for a domestic violence case. However, the evidence presented at the suppression hearing was not sufficient, nor reliable enough, to rise to the level of a reasonable belief that Rosario resided at the home Agent González and his fellow agents forced their way into on the date in question. Let us examine the evidence that was presented at the suppression hearings on the information the officers had, and the steps taken by the police to learn where Rosario lived.

Sergeant Pérez testified that Officer Candelaria investigated a domestic violence complaint by the alleged victim identified at the hearing as Karielis Meléndez ("Karielis"). Probable cause was found in absentia by the state court and an arrest warrant issued. According to Sergeant Pérez, the investigation revealed that Rosario was residing at Almirante Norte in Vega Baja, on Road 160. This information was allegedly provided by Karielis. Sergeant Pérez further testified that Officer Candelaria went to Almirante Norte with Karielis and she pinpointed the house where Rosario lived "practically in front of the residence." (Tr. Day 1 at 80). No evidence was presented, however, as to how Karielis knew that was Rosario's residence or how recent the information was.[4] No surveillance was conducted either. On May 15, 2025, Officer Candelaria texted Sergeant Pérez a

---

[4] To the extent that the Government invites the Court to infer that because there may have been a brief romantic relationship at some point between Rosario and Karielis, she must have known where he lived, such inference would be unreasonable on this record. There were no details introduced into evidence about the nature and length of the relationship. The Government could have presented Karielis' testimony. It chose not to do so, relying instead on double hearsay, and yet failed to establish the basis of Karelis' knowledge that the house she identified was Rosario's residence. The Government also could have presented the testimony of Officer Candelaria.

photograph of the residence and the location (pin). She, in turn, forwarded the arrest warrant, the photograph, and the pin to the Arecibo arrest division. The supervisor of that unit, Gamalier Delgado, assigned the case to Agent González to lead a team to execute the arrest.

Agent González, for his part, testified that he spoke to Officer Candelaria, who told him that the residence in the photograph was Rosario's. Officer Candelaria did not say how he knew that. Agent González also testified that he interviewed the alleged victim, Karielis, but she only said that Rosario lived in Vega Baja. Agent González conducted no surveillance nor any additional investigation of his own. He did not even read the file, the complaint (denuncia), or the work plan.  All he reviewed was the arrest warrant and used the pin and the photograph to arrive at the house. Confident enough that he had the correct residence, he knocked, announced his presence, and in less than a minute, broke down gates and doors to enter the home. In my view, this is not enough to establish reasonable belief of residence.

I recognize that the issue of whether Rosario resided there is a close question because (1) the reasonable belief standard is relatively low and (2) the fact that the alleged victim of domestic violence identified the residence to officer Candelaria could have provided a reasonable belief that the Defendant lived there. *See Graham*, 553 F.3d at 13 (the police need not possess rock-solid indicators of residence). Nevertheless, I reiterate my finding that the information was not sufficient inasmuch as the quantity and quality of the evidence they had required, in my opinion, that the officers did more to corroborate. *United States v. Brinkley*, 980 F.3d 377, 386 (4th Cir. 2020) ("The quantity and quality of information known to officers bear on whether they have [reasonable

belief], with less reliable information requiring more corroboration.") Here, the information regarding Rosario's residence was sparse and the evidence presented at the suppression hearing did not instill in the undersigned any confidence that such information was reliable. Again, the Government relied on several layers of hearsay to establish reasonable belief.[5] For example, Sergeant Pérez's testimony relayed what Officer Candelaria told her regarding what the victim said; that Rosario lived on Road 160, Almirante Norte, Vega Baja. However, Karielis did not provide a house number or other details as to the specific residence. And to Agent González, all she told him was that Rosario lived in Vega Baja. As previously noted, no evidence was presented as to how Karielis knew the residence she pinpointed was Rosario's. If all that was needed for the Government to establish a valid entry into a home under *Payton v. New York* was double hearsay evidence that a complainant pointed to a house, the reasonable belief standard, low as it is, would be rendered completely ineffectual.

### 2.    *Presence*

Even if the evidence is found to be sufficient to hold that Agent González and his fellow officers reasonably believed that Rosario resided at the home they entered on May 20, 2025, the evidence falls short of establishing they had a reasonable belief that he was present. The only evidence the Government highlights to argue that PRPB agents reasonably believed Rosario would be present at the residence is the fact that there was

---

[5] I overruled all of the defense's objections on grounds of hearsay because "[t]he Federal Rules of Evidence, apart from testimonial privileges, do not apply at suppression hearings." *United States v. Bunell*, 280 F.3d 46, 49 (1st Cir. 2002) (citing *United States v. Schaefer*, 87 F.3d 562, 570 (1st Cir. 1996)). However, I consider the reliability of such evidence in examining the basis for the officer's belief as to both residence and presence.

20

a Toyota Tacoma parked outside and that in the early morning hours a person would be expected to be home prior to going to work. (Docket No. 98 at 3). However, there was no evidence before the court indicating that any of the PRPB agents involved in this case had any prior knowledge that Rosario drove a Tacoma. On cross-examination, Agent González testified as follows:

> Q And prior to arriving at the house, you had no information
> about that Tacoma, correct?
>
> A No.
>
> Q The first time that you knew that he was the owner of a
> Toyota Tacoma was upon him telling you at the house.
>
> A Yes, that is correct.

(Transcript, Docket No. 84 at 66, line 15-20). The United States has cited no authority for the proposition that the fact that any car is parked in front of a residence perforce establishes a reasonable belief that the person to be arrested is present. On the contrary, courts have found that the *Payton v. New York* presence requirement is met only when agents are aware of some connection between a car parked outside and the defendant. *See Valdez v. McPheters*, 172 F.3d 1220, 1226 (10th Cir. 1999) (the presence of a car associated with the suspect is a type of circumstantial evidence that suggests the individual named in the arrest warrant is present.); *United States v. Stewart*, 102 F. Supp. 3d 392, 398-99 (D.R.I. 2015) (holding that officers reasonably believed that the defendant resided in an apartment associated with another individual and would be present in part because a car in which the officers had seen the defendant get into the day before was parked at the apartment.); *United States v. Guerrro-Nuñez*, No. 24-cr-026-SE, 2025 WL 473766, 2025 U.S. Dist. LEXIS 25003, at *18 (D.N.H. Feb. 12, 2025)

("[T]he investigation connected Guerrero-Nuñez to the Jeep and there is no evidence that he was connected to any other vehicle.").

The other piece of information the Government points out is the time of day, i.e., early morning hours. But the First Circuit has noted that the time of day, standing alone, is insufficient to support the conclusion that a defendant was present. *Young*, 835 F.3d at 22 (citing *Werra*, 638 F.3d at 339). Timing has been deemed a factor supporting a reasonable belief of presence "when there was no serious question that the location of the arrest was where the defendant lived." *Werra*, 638 F.3d at 339. Here, as stated above, the evidence presented raised serious questions regarding the reasonableness of the PRPB officers' belief that Rosario resided at the place where he was arrested. And similar to *Young* and *Werra*, the police made no effort to confirm Rosario's presence in the residence before entering. *Young*, 835 F.3d at 23 (noting that "officers did nothing to confirm Young's presence before entering the apartment."); *Werra*, 638 F.3d at 338 (observing that "the officers made no attempt to confirm the currentness of [the informant's] information by, for example, conducting surveillance or placing a telephone call to the house."). In this case, nothing prevented the agents from conducting additional surveillance or employing other investigative techniques to confirm Rosario's presence. Suppression is warranted.

**C.    Plain View and Protective Sweep**

In the alternative, even assuming that the PRPB officers' entry into Rosario's home was lawful, I would still recommend that the motion to suppress be granted. The arrest warrant only permitted the agents to seize Rosario; it did not authorize them, without more, to search the home. *Graham*, 553 F.3d at 15. The Government advances

two theories to support the agents' actions inside Rosario's home once they entered. The Government first argues that pistol magazines were observed in plain view. Second, the Government claims that the PRPB agents were justified in conducting a protective sweep. Neither theory saves the day for the Government.

The plain view doctrine is one of the recognized exceptions to the general rule that warrantless searches and seizures are *per se* unreasonable. *See Coolidge v. New Hampshire*, 403 U.S. 443, 468 (1971). The plain view doctrine "permits the warrantless seizure of an item if the officer is **lawfully present in a position from which the item is clearly visible**, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself." *United States v. Gamache*, 792 F.3d 194, 199 (1st Cir. 2015) (emphasis added). "The first element of the test is straightforward and easy to apply." *United States v. Badillo-Hernandez*, No. 24-cr-148 (ADC), 2025 WL 1906755, 2025 U.S. Dist. LEXIS 132593, at * 14 (July 10, 2015) (Lopez-Soler, M.J.). The initial warrantless intrusion must be lawful under the Fourth Amendment so that an officer can be said to have lawfully arrived at the place from which he or she plainly could view the seized object. *United States v. Jones*, 187 F.3d 210, 219 (1st Cir. 1999) (citations omitted). The object, in turn, must be "easily visible to the naked eye." *United States v. Sanchez*, 612 F.3d 1, 5 (1st Cir. 2010). The second element is satisfied when the incriminating character of the evidence is immediately apparent to the officer, that is, there is probable cause to believe it is evidence of criminal activity. *United States v. Hammie*, 165 F.3d 80, 83 (1st Cir. 1999). As to the third element—lawful right to access the item itself—the court must ask not whether the officer was lawfully in a position to see the contraband, which is the first element of the test; rather, whether the officer "could lawfully seize it without

23

committing a trespass." *United States v. Allen*, 573 F.3d 42, 51 n.4 (1st Cir. 2009); *see also United States v. Keleher*, 516 F. Supp. 3d 162, 168 (D.P.R. 2021) (seizure of emails did not constitute a trespass because they were already in the government's possession.).

The Government fails at the first element of the test. Again, as stated above, PRPB agents unlawfully entered the house without a search warrant in violation of the *Payton v. New York* framework and were, therefore, not lawfully present in a position where pistol magazines could be observed. But even if they were, I do not find the testimony of Agent González that the magazines were on a table in Rosario's kitchen to be credible. I do credit both Ms. Chico's testimony[6] that there was nothing illegal or dangerous plainly visible in the kitchen and Rosario's answer in his custodial interview that the magazines were in a cupboard. The more plausible version in this case, based on my credibility assessment, is that the magazines were discovered by the PRPB agents inside the cupboard above the refrigerator, a place PRPB agents had no authority to search. I explain.

Agent González's testimony was plagued with internal inconsistencies and factual assertions that defy common sense. Also, his demeanor came across as completely unbothered *vis à vis* the seriousness of allegations that he entered a home in violation of Fourth Amendment rights. For example, on direct examination, Agent González

---

[6]    Certainly, the testimony of Ms. Chico, as the consensual partner of Rosario, should be carefully scrutinized. However, different from Agent González, when confronted, she acknowledged the facts that did not necessarily favor Rosario's position. On cross-examination she candidly admitted she knew Rosario possessed a firearm and never reported him to the police. Ms. Chico also admitted she loves Rosario, wants the best for him, and would not like for him to get in trouble or go to jail. But that she came to Court to tell the truth, to say "what it is." (Tr. Docket No. 84 at 172). Her demeanor testifying did not raise any red flags about mendacity beyond the obvious potential motive to lie.

nonchalantly described how he and his fellow agents knocked on the door, identified themselves as police officers, and proceeded to enter by "opening" the door and gate. (Tr. Docket No. 84 at 20). It wasn't until he was confronted during cross-examination that he admitted that he and his fellow officers barged in after breaking the door and gate with a crowbar and battering ram, respectively. (Id. at 47). Agent González also testified that he was at the "frame of the door" when he saw Rosario for the first time standing three feet from him. But the evidence showed that Rosario was hit by the gate the agents broke, injuring his hand. Ms. Chico testified how Rosario was bleeding. He was later taken to the hospital. Agent González minimized this by saying Rosario had "like a scratch on his hand." (Id. at 70).

I am also troubled by the fact that Agent González would not admit that he placed Rosario on the ground, a fact that two witnesses (Ms. Chico and Ms. Velázquez-Lugo) corroborated. Rosario also mentioned having been placed on the floor during his custodial interview with ATF agents. (Docket No. 72-1 at 2). Yet, Agent González denied that he ever placed Rosario on the floor. Aside from the entry itself, there are no allegations here of excessive force used against Rosario in executing the arrest. Thus, temporarily ordering the Defendant to the ground to handcuff him would not have been controversial. *See Mercurio v. Town of Sherborn*, 287 F. Supp. 3d 109, 119 (D. Mass. 2017) (citations omitted) ("Fourth Amendment jurisprudence has long recognized that the right to make an arrest [or seizure] necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it, . . . the relevant inquiry is whether the force used was objectively reasonable under all the circumstances, that is, whether it was consistent with the amount of force that a reasonable police officer would

think necessary to bring the arrestee into custody."). But for some reason, Agent González testified falsely about a relatively innocuous and immaterial fact. Similarly, Agent González was not truthful about having handcuffed Rosario in the back. He testified that he changed the handcuffs to the front so that Rosario could sign Miranda warnings, consent forms, and hand the keys to the Tacoma. According to Agent González, Rosario stayed that way (handcuffed in front) for the remainder of the intervention at the house. (Tr. Docket No. 84 at 59-60, 64). However, the testimony of Ms. Velázquez-Lugo, which I credit, was that she saw when Rosario was brought out to the Tacoma with his hands handcuffed in the back. (Tr. Docket No. 82 at 14-15).

Agent González also testified that after arresting him, he had Rosario sign a Miranda warnings acknowledgment. (Exhibit C). Rosario marked the option that he did not waive his rights. Nonetheless, Agent González proceeded to ask Rosario questions and when confronted, limited himself to say that "he [Rosario] never told me, 'I'm not going to speak. I want an attorney.'" (Tr. Docket No. 84 at 53). This shows a complete disregard for constitutional rights. As does the way that agents behaved that day as per Ms. Chico's testimony. I credit Ms. Chico's version that agents rummaged around the house despite Agent González' categorical assertion that "no one opened drawers or bags or personal belongings." (Id. at 63). I also find credible that an officer told her they would call the Department of Family Services to remove her child unless Rosario "cooperated." And that she had to change clothes in front of a male officer. Lastly, why agents felt the need to strike security cameras with a stick as testified by Ms. Velázquez-Lugo (Tr. Docket No. 82 at 12) is beyond me. Such action suggests consciousness of wrongdoing by the officers.

The Government argues that Defendant's custodial interview corroborates Agent González's plain view observations. (Docket No. 98 at 8). In so arguing, the Government quotes from the transcript of the interview the following passage: "Okay, the, the... when the police come in, they observed, there were some, some magazines, some magazines, with bullets...[o] on the microwave table..." "...I heard, I heard what he told you... Yes, that was there." (Docket No. 72-1). The Government states that this was an "unequivocal response" that the pistol magazines were in plain view in the microwave table.  However, the Government wishes the Court to disregard what Rosario said next in response to a question by an agent that sought clarification if the magazines were "on top of the little table that you have next to the microwave ...." (Id.). Rosario said: "There is the refrigerator . . . and above the refrigerator in the cupboard[7] . . . [t]hey were on." (Id.). Based on the full context of this portion of the interview, and with Agent González's credibility seriously compromised as discussed above, I find that rather than corroborating Agent González's claim that he observed the magazines in plain view, the excerpt establishes the contrary.  The pistol magazines were out of view in a pantry and discovered only *after* a search.

The Government additionally contends that the agents' actions at the home were justified because "[o]nce law enforcement possesses a reasonable basis to enter a residence, they may conduct a protective sweep of the premises." (Docket No. 98 at 4).

---

[7]    In the recoding, the word used in Spanish was "alacena" that roughly translates to "pantry." Merriam-webster defines cupboard as "a closet with shelves where dishes, utensils, or food is kept. CUPBOARD Definition & Meaning - Merriam-Webster. I cannot accept the Government's argument that the explanation by Rosario "implies the magazines were not hidden or in an enclosed area or compartment like a kitchen cabinet." (Docket No. 98 at 9, n.6.).

The Supreme Court has held that a protective sweep, that is, "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others," and that "is narrowly confined to a cursory visual inspection of those places in which a person might be hiding" is one of the exceptions to the rule that warrantless searches are presumptively unreasonable. *United States v. Delgado-Perez*, 867 F.3d at 251 (quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990)). The Government cannot invoke this exception because, as noted, I do not believe that the magazines were in plain view on a table in front of a microwave. In order to find the magazines, agents had to search the cupboard above the refrigerator, and the Government has not advanced any argument or proffered any evidence establishing or indicating that a pantry or cupboard is a place in which a person might be hiding.

**D.    Consent**

Lastly, I need not decide if Rosario voluntarily consented to a search of his vehicle and the related issue regarding whether consent forms were signed at the residence or later at the police station as the defense claims. Even if consent forms were voluntarily signed at the home prior to any search of the vehicle or the search of the second story of the home for the additional magazine, such consent is tainted by the Fourth Amendment violation related to the unlawful entry and ensuing warrantless search.

When the claim is that consent was tainted by a Fourth Amendment violation, "courts must determine whether the causal link between a prior unlawful search and consent (voluntary though it may have been) to a subsequent search is so tight that the evidence acquired pursuant to that consent must be suppressed." *United States v. Cordero-Rosario*, 786 F.3d 64, 76 (1st Cir. 2015) (citing *United States v. Navedo-Colon*,

996 F.2d 1337, 1339 (1st Cir. 1993)). Suppression is not warranted, however, where the causal link between the initial illegality and subsequent consent is "sufficiently attenuated." *United States v. Serrano-Acevedo*, 892 F.3d 454, 460 (1st Cir. 2018). The government bears the burden of proving that there was a sufficient break in the causal connection between the illegality and the consent. *See Brown v. Illinois*, 422 U.S. 590, 604 (1975). The First Circuit has "emphasized the importance of determining whether the prior illegality 'significantly influenced' or 'played a significant role' in the subsequent consent." *Cordero-Rosario*, 786 F.3d at 76. Several factors are relevant to the inquiry: "temporal proximity", "the presence of intervening circumstances", and "the purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. at 603-04.

The Government has not even attempted to make a showing of attenuation because it insists that there was nothing wrong with the law enforcement officers' conduct. However, applying the relevant factors, it is not difficult to conclude that the causal link between the Fourth Amendment violations and the consent to search the vehicle and bedroom drawer is strong. *See Delgado-Perez*, 867 F.3d at 256. First, as to temporal proximity, consent was given shortly (almost immediately) after the unlawful entry into the home. Moreover, there were no intervening circumstances. Rosario remained arrested at his house for at least two and a half hours (if Ms. Chico's estimation is accurate), injured, and his family detained and subjected to indignities. There is absolutely no indication that Rosario would have consented to the searches had it not been for Agent González and his crew's unlawful entry into the home. *Serrano-Acevedo*, 892 F.3d at 461 ("The record provides no indication that Diaz would have consented to the search if not for the unconstitutional sweep and what it uncovered."). There is

likewise no indication that even assuming the entry was lawful, that Rosario would have been asked about firearms but for the fact that agents conducted a warrantless search that revealed the presence of firearm magazines in the home. Finally, the flagrancy of the officers' misconduct has been extensively discussed.

## IV.    CONCLUSION

"Because the prophylaxis of the Fourth Amendment protections is at its zenith with respect to an individual's home, a warrantless search of a private residence is presumptively unreasonable unless one of a few well-delineated exceptions apply." *United States v. Infante*, 701 F.3d 386, 392 (1st Cir. 2012). The Government has failed to overcome said presumption in this case. Accordingly, I recommend that the motion to suppress at Docket No. 44 be **GRANTED**.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be filed with the Clerk of Court **within 14 days**. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico this 15th day of May, 2026.

S/Héctor L. Ramos-Vega
HÉCTOR L. RAMOS-VEGA
UNITED STATES MAGISTRATE JUDGE

30